# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 2, 2004

## STATE OF TENNESSEE v. SEAN ANTHONY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-01482     Chris Craft, Judge**

_____

**No. W2003-01440-CCA-R3-CD  - Filed September 21, 2004**
_____

The Defendant, Sean Anthony, was tried and convicted of four counts of aggravated robbery.  On appeal he contends that: (1) the trial court improperly refused to accept his guilty plea; (2) the trial court should have suppressed his statement to police; and (3) the evidence is insufficient to sustain his convictions.  Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Ross A. Sampson, Memphis, Tennessee, for the appellant Sean Anthony.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; William L. Gibbons, District Attorney General; Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises out of the Defendant's convictions of the aggravated robbery of four separate victims at the Big Star grocery store in Memphis, Tennessee on August 6, 2001.

### A.  Guilty Plea Hearings

Prior to trial for these crimes, on October 16 and 17 of 2002, the trial court held two separate guilty plea hearings where the Defendant attempted to enter guilty pleas to four counts of robbery, a lesser-included offense of the indicted charges in each count.  At the first hearing, the State told the trial court that the Defendant was indicted for four counts of aggravated robbery and that he

would be pleading guilty to four counts of robbery. The prosecutor stated that the State was recommending a sentence of six years. The State articulated the facts that it intended to prove if the case were to go to trial, and the Defendant's attorney agreed with those facts and asked the court to accept the guilty plea. The trial court asked the State why it was reducing the crime from aggravated robbery to robbery, and the State informed the court that it was given information that the Defendant was "low functioning . . . [and] has a history of mental retardation . . . ." The Defendant's attorney informed the court that there was "no question" that the Defendant was competent to enter the guilty plea.

Upon the court's questioning, the Defendant testified that he had reached the ninth grade in school and that he has a problem reading. The trial court informed the Defendant of each of his rights and asked the Defendant if he understood those rights and understood that, by entering a guilty plea, he would waive those rights. The trial court told the Defendant that, were the Defendant convicted of aggravated robbery, the court would "have to sentence you to somewhere between 8 and 30 years in prison with no possibility of probation." The court also told the Defendant that robbery carries a 3 to 15 year sentence. The Defendant told the court that he understood. The trial court explained the elements of the offenses to the Defendant, and further explained that, should the Defendant opt for a jury trial, the State would be required to prove the Defendant's guilt of the offenses beyond a reasonable doubt to a jury of the Defendant's peers.

The State then announced the agreement between the parties, stating that the Defendant would plead guilty to robbery in count one, with the recommended six year sentence, and in counts 2, 3 and 4 he would plead guilty to robbery, with the recommended six year sentence, all to run concurrently with each other and with count one. The following then occurred:

> THE COURT: . . . you're pleading to four separate robbery convictions of four separate people. Getting six years on each one to be served at the same time and asking for probation. Is that your understanding of what we're doing?
> THE DEFENDANT: No, Sir.
> THE COURT: It's not?
> THE DEFENDANT: No, sir.
> THE COURT: What's your understanding?
> THE DEFENDANT: That I do six years on probation and six months in Project Wit.
> THE COURT: No, sir. I may not give you any probation. You may go to prison today for six years. Then again I may give you complete probation and you don't even have to go to Project Wit. That's up to me. I have not decided yet what you're going to be doing. So you're pleading guilty to six years in prison on four separate robberies of four separate people. Do you understand that?
> THE DEFENDANT: No, not really.

The State then revoked the plea offer, and the trial court told the Defendant that he would not be allowed to plead guilty. The following day the trial court held another guilty plea hearing where the Defendant testified, and the Defendant's attorney asked him if he understood what happened

yesterday, and the Defendant responded affirmatively. The Defendant's attorney asked the Defendant if the attorney had explained that there were four aggravated robbery charges and that the Defendant was going to plead guilty to four robbery charges. The Defendant said that this had been explained to him and that he misunderstood the judge the previous day and did not understand the sentence that he would be serving. The Defendant then indicated that he would like to plead guilty. The following then occurred:

> THE COURT: Well, let me ask you this just to clarify for the record . . . . You understand that if the State allowed you to enter this guilty plea today and we had our hearing, I could send you to prison for six years. In other words I don't have to put you on probation. I could just sentence you to prison for six years. Do you understand that?
> THE DEFENDANT: Yes, sir.
> THE COURT: Knowing all that would you still want to enter the plea?
> THE DEFENDANT: No.

The trial court then found that the Defendant did not understand the plea and, for that reason, did not accept the plea from the Defendant.

### B. Hearing on Defendant's Motion to Suppress

On November 26, 2002, the trial court held a hearing on the Defendant's motion to suppress his statement to police. At the hearing, Ralph Peperone, an officer with the Memphis Police Department testified that he interviewed the Defendant about his involvement in the robbery. The officer said that he advised the Defendant of his rights prior to talking with him, and the Defendant waived his rights. The officer said that the Defendant told him that he dropped out of school in the ninth grade, and the officer opined that the Defendant was "a little slow." The officer explained, "He required thought, more thought in questions than many people. Just to take his time before he gave us an answer." The officer said that the Defendant gave he and another officer a statement that they reduced to writing, read to the Defendant to insure accuracy, and the Defendant signed. Officer Peperone testified that he did not threaten the Defendant or promise him leniency.

On cross-examination, Officer Peperone said that he was not the arresting officer and that the Defendant was brought to his office after receiving medical care. The officer said that he did not make a notation on the advice of rights form that he read the form to the Defendant. The officer said that he explained the Defendant's rights to him prior to the Defendant signing the form. On re-direct the officer testified that the last thing he told the Defendant was, "I will have Officer Dale Hensley, 3592, read the statement to you. If you find it to be true and correct as you have given I will ask you to initial the bottom of each page and place your signature along with the date and time on the line below. Do you understand?" The officer testified that the Defendant indicated that he understood.

Timothy Cecil Lewis, a deputy clerk in the Shelby County Criminal Court clerk's office, testified that the Defendant had previously pled guilty to criminal attempt to commit aggravated

burglary, simple possession of a controlled substance, and aggravated burglary. On cross-examination, Lewis testified that he was not aware of the Defendant's mental condition.

The Defendant testified that he could not read the advice of rights form, but that he did remember signing the form. He said that the form was never read to him, and Officer Peperone handed it to him and told him to sign it. He testified that the officer then handed him more papers to sign, and, after he signed the papers, the officer asked him if he could read or write. The Defendant said that no one explained to him the right to remain silent or the right to have a lawyer present and that he did not know whether he knew what those rights meant. The Defendant testified that he spent time at a home that helps people with his disability and that he receives Social Security Income checks for his disability. The Defendant said that he remembered attempting to enter a guilty plea, but he got confused and was unable to enter the plea.

On cross-examination, the Defendant said that the officers pushed a piece of paper in front of him and told him to sign it. He testified that there were some pictures laying on the table and the officers asked him if he knew the men in the pictures and the Defendant responded that he did. The Defendant said that, when the officer read him his statement, they read it fast, and he could not understand the statement. The Defendant conceded that he had been arrested a number of times for different offenses. He said that he knew that he had a right not to talk to police and that he had a right to an attorney. The Defendant said that he had given statements to police before about other crimes that he had committed.

Based upon this evidence the trial court denied the Defendant's motion to suppress his statement to police.

## C. Trial

At the Defendant's trial, in January of 2003, the following evidence was presented. Teresa Regina Stegall testified that she was an employee of Big Star grocery store in Shelby County on August 6, 2001. She said that, on that day, she was working as a cashier at a cash register when two men came into the store. She said that one of the men, who had on a gray and red stripped shirt, came to her register. She described the man as an African-American who wore a bandana covering his face from his nose down and a hat. Stegall testified that the man had a gun that looked like a .25 caliber gun and looked like he was in his twenties. She said that the man pointed his gun at her face and said "Open the cash register." The man then took both the cash and the checks out of the cash register, and then he robbed a customer and a second cashier.

Stegall described the second intruder as having on a ski mask and dark colored clothing. She said that the second intruder also had a gun and went to the customer service desk, which is about fifteen to twenty feet from the cashiers, and pointed the gun at the office worker. Stegall stated that the men were in the store for approximately twenty to thirty seconds and then ran out the front door. She said that, after they ran out the door, she heard a "pop, pop" and saw a bullet hole at the bottom of the door where they shot the glass. Stegall was unable to identify the Defendant as one of the

4

intruders. On cross-examination, Stegall reiterated that she could not identify the Defendant and said that she did not see a vehicle involved in this crime.

Regina Coretta Davis testified that, on August 6, 2001, she was shopping at the Big Star grocery store when two men came in and robbed the store. She said that she was at the cash register preparing to pay for her purchase when one of the men, who had on a stripped shirt, came to the cash register beside her. She explained that he got the money out of the register next to her first and then got the money out of the register where she was. Davis stated that the man put a gun to her head, told her, "Give me your money," and then took money out of her hand and told her to open her purse. She said that she threw her purse at him. Davis testified that the other man went to the back of the store to the customer service desk. She said that, after she was robbed, the two men went out the front door and one of them shot twice at the door. Davis was unable to identify the Defendant as the man who robbed her.

Antoinette Hubbard testified that she worked at Big Star grocery store as a cashier and was working on August 6, 2001, when two men came in and robbed the store. She said that a man, who was six feet tall, came to her register and took all of the money out of the register. She said that she was scared and was unable to see the face of the person who robbed her. Hubbard was unable to identify the Defendant as the man who robbed her. On cross-examination, Hubbard testified that none of her personal possessions were taken during the robbery.

Leslie Kay Ross testified that she was working at the customer service booth at Big Star grocery store on August 6, 2001, when two men robbed the store. She said that the man robbing the cash registers was wearing a striped shirt and a bandana. She described the man who robbed her as approximately five feet nine inches tall, "not heavy set, but not skinny and he was a male black," who had a ski mask, so she could only see his eyes. Ross explained that the man who robbed her said "open the drawer, B****," while pointing a silver and black gun at her. Ross said that the man who robbed her had on latex gloves, and she said that, after the men left, she heard two gun shots. She said that she could not recognize the man who robbed her, but she did recognize a black hat and some latex gloves that were shown to her after the robbery. On cross-examination, Ross said that she could not be sure that the hat and gloves were those as those worn by the robber, only that they looked similar.

William N. Warren, Jr., testified that, on August 6, 2001, he briefly walked into Big Star grocery store where he saw a man standing at the cash register with a gun. He described the man as a "black person" who was wearing "a white tank top shirt . . ., black jogging pants and a bandana around his face." Warren stated that, when he saw the robbery in progress, he turned around and went back out of the store. He explained that he ran around to the side of the store and hid, and then he heard gunshots. Warren said that he got into his friend's truck, and his friend drove him around the back of the store where he saw two "black males running down the street." He said that he followed the two men on foot and noticed that they threw something in the bushes, then he saw the police and they took over the chase. Warren identified a picture of the house near the bushes where the robbers threw something, but was unable to identify the man that he saw robbing the store. On

cross-examination, Warren again said that the robber he saw was wearing a white tank top and, when shown the video tape of the robbery, he said that neither robber was wearing a tank top. He clarified that, when the robber was arrested, he was wearing a tank top. Warren said that, as the men were running, he could not see what was in their hands. Warren testified that he could not identify anyone as the robber.

Calvin E. Taylor, an officer with the Memphis Police Department, testified that he was called to the scene of a robbery on August 6, 2001, at a Big Star grocery store. He said that, when he got the call, he was approximately one minute away from the store and headed toward the store. On the way to the store, the officer met two suspects that fit the robbers' description, and he identified the Defendant as one of those suspects. The officer said that he got out of the car and told the Defendant to get down and get on the ground, which the Defendant refused to do, so the officer sprayed him with pepper gas, handcuffed him, and placed him in the back of his police car. Officer Taylor testified that, on the Defendant, he found $1,374.70 in cash and one check made out to Big Star in the amount of $9.70. The officer said that, after he placed the Defendant in his car, he took him to the scene of the robbery and then to receive medical attention for a dislocated shoulder.

Joe Edward Stark, an officer with the Memphis Police Department, testified that he was called to the crime scene at Big Star grocery store on August 6, 2001, to collect evidence. He said that he found two spent .22 caliber casings just outside the front door of the store. The officer said that, as part of the investigation, he went to a nearby house where, under a bush, he found two .22 caliber handguns and a "black skull cap" with the eyes cut out. Officer Stark described one of the guns as a revolver that had a gray body and a white handle and the other gun as a black automatic gun. The officer testified that, at another nearby house, he found a long sleeve striped shirt inside a barbecue pit in the backyard. Officer Stark indicated that he also found multiple Big Star receipts on the ground around the barbecue pit. The officer said that he found and took a pair of latex gloves to be chemically processed for fingerprints. On cross-examination, the officer testified that he did not see a check for $9.70 during his investigation.

Ralph Peperone, a Sergeant with the Memphis Police Department, testified that he was working in the robbery bureau on August 6, 2001, and was assigned to this case as the case coordinator. The officer said that before he interviewed the Defendant, who was a suspect in this case, he read him his Miranda rights, and the Defendant signed a form waiving those rights. Officer Peperone explained that, on the form, the Defendant indicated that he was 22 years old, had last attended ninth grade in school, and was not employed. The officer said that the Defendant seemed to understand his rights, but he spoke a little slow and took more time understanding facts. The officer said that, after the Defendant waived his rights, the officer took his statement and reduced that statement to writing. Officer Peperone had Detective Dale Hensley read the statement to the Defendant, and the Defendant signed the statement.

The officer read the Defendant's statement into evidence. In the Defendant's statement, he told police that he participated in a robbery of the Big Star grocery store that occurred around 5:30 p.m. on Monday, August 6, 2001. The Defendant said that he did not know the people that he

robbed and that he was armed with a .22 pistol during the robbery that he bought "from somebody off the street." The Defendant said that he, his brother and a man named "Hop" participated in this robbery. The Defendant said that, as a result of the robbery, the men got money. The Defendant described the events of the crime by saying that the three men were riding in a borrowed blue Toyota Camry when "Hop" got out and went to check the store. He said that "Hop" bought some milk and then came back and told he and his brother that there were no security guards in the store. The Defendant explained that he and his brother ran into the store and told them to open the cash register and then took the money out of the registers. The Defendant said that his brother told him that someone tried to grab him so he shot in the air. The Defendant told the police that he "ran until [he] could run no more" because the police surrounded them. He said that, at the time of the robbery, he was wearing black pants, a black shirt, and a black mask that he had cut two holes in, and his brother was wearing blue jeans, a brown scarf, and a multi-colored shirt. The Defendant said that his brother also was armed with a .22 pistol during the robbery.

On cross-examination, Officer Peperone testified that when he first saw the Defendant the evening of the robbery, at around 8:30 p.m., the Defendant's arm was in a sling, and he had some bandages on him. The officer said that the Defendant was not given any pain relievers prior to the interview, and he was cooperative during the interview. The officer said that he first began speaking with the Defendant at around 10:00 p.m. and again the officer said that the Defendant was a "little slow." The officer testified that Markel Adkins, who is also known as "Hop" or "Hopping Grass," had been implicated in this robbery.

The Defendant called Lilly Murray, his mother, who testified that the Defendant receives Social Security Income for mental retardation. She said that he has received this income since he was about nine or ten and that, as a result of his retardation, he cannot read or write. Murray testified that, also as a result of the retardation, the Defendant can be easily talked into things because he does not understand. She said that the Defendant knows the difference between wright and wrong. On cross-examination, Murray testified that the Defendant can write his name and can read a little bit, but has problems with small words.

Based upon this evidence, the jury found the Defendant guilty of four counts of aggravated robbery.

## II. Analysis

The Defendant appeals his conviction contending that: (1) the trial court improperly refused to accept his guilty plea; (2) the trial court should have suppressed his statement to police; and (3) the evidence is insufficient to sustain his convictions.

## A. Guilty Plea

The Defendant contends that the trial court improperly denied him the right to enter pleas of guilty to four counts of robbery, which were lesser-included offenses of the indicted charges. The

Defendant asserts that he intended to enter his guilty pleas knowingly, intelligently, and voluntarily, and that, due to his low-functioning mental ability, he did not properly answer the trial court's questions. The State counters that the trial court properly rejected the Defendant's guilty pleas because the Defendant did not understand the maximum penalties provided by law and it was unclear whether the pleas were voluntary. When it rejected the Defendant's guilty pleas, the trial court said:

> [L]et me just say this as the judge here this man does not understand this plea. He just doesn't understand that. And for that reason I'm not going to take a plea from this man. I just can't . . . do it. And I understand that [the Defendant's attorney] was most patient yesterday. He spent hours with this young man. And either by design or by not having the intelligence to understand, with all due respect to him, he doesn't – I have no confidence in this man's ability to be honest with us about what he wants to do with this case. I just don't. And I think that's one of the reasons [the State's attorney] doesn't want to fool with it. So we just can't take a plea because knowing he keeps saying yes, I'd like to. And if I asked him some more questions he'd say I think I'm going to get probation. And I think what he thinks is that he's got a good chance at it and pretty much he thinks he's probably been promised that he'd get probation. And I don't want him to have that idea. Because he can't be entering these pleas without any hopes. He can have a hope but he can't have a pressure or a promise.

The trial court then told the Defendant that it would not accept his guilty plea, and the court noted that the Defendant did not "seem at all upset about" the trial court's ruling.

The trial court is afforded discretion in the acceptance of a plea, and the judgment cannot be set aside absent a plain abuse of authority. State v. Williams, 851 S.W.2d 828, 830 (Tenn. Crim. App. 1992). To find that a trial court has abused its discretion in refusing to accept a plea of guilty, it must appear that no substantial evidence supports the conclusion of the trial court. Goobsy v. State, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995). Also, the trial court has the ultimate decision to accept or reject a guilty plea within its sound discretion. Farmer v. State, 570 S.W.2d 359, 361 (Tenn. Crim. App. 1978). Tennessee Rule of Criminal Procedure 11 governs the acceptance and rejection of guilty pleas. It states:

> Before accepting a plea of guilty . . . the court must address the defendant personally in open court and inform the defendant of, and determine that he or she understands, the following:
> (1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law . . . .
>
> The court shall not accept a plea of guilty . . . without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement.

8

Tenn. R. Crim. P. 11 (c)(1), (d). A trial court has discretion to determine whether the plea is voluntary and whether the defendant is knowingly and understandingly waving his constitutional rights. Tenn. R. Crim. P. 11(c), (d); Goobsy, 917 S.W.2d at 706.

In the case under submission, the trial court complied with Tennessee Rule of Criminal Procedure 11 when it rejected the Defendant's plea of guilty. One valid reason to reject a guilty plea is that the Defendant does not understand the maximum punishment and, therefore, the plea is not knowingly and voluntarily entered. Tenn. R. Crim. P. (c)(1), (d). We conclude that the trial court did not abuse its discretion when it determined that the Defendant could not knowingly and voluntarily enter a guilty plea because, by design or because of lack of intelligence, he did not understand the maximum punishment. The trial court explained the possible maximum punishment to the Defendant and, thereafter, the Defendant said that he would not like to enter a plea of guilty. Accordingly, we hold that this issue is without merit.

### B. Motion to Suppress

The Defendant contends that the statement that he gave to police should have been suppressed because he did not "fully understand his Miranda rights due to his low mental capacity." The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). When the trial court makes findings of fact at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings of fact are "presumptively correct on appeal" and are binding upon this Court unless the evidence in the record preponderates against them. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002); State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); Odom, 928 S.W.2d at 23. The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

The Fifth Amendment to the United States Constitution provides, in pertinent part, that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479 (1966). If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322 (1994).

9

A criminal defendant may waive his Miranda rights, but such a waiver must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444. The waiver must be "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." State v. Blackstock, 19 S.W.3d 200, 208 (citing State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn.1992). The totality of the circumstances in a case such as this one must reveal "an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived." Blackstock, 19 S.W.3d at 208.

The Tennessee Supreme Court addressed the issue of the voluntariness of confessions of people suffering from low mental capacity in Blackstock, stating:

> The effect of an accused's mental deficiencies or retardation on the validity of his decision to waive Miranda rights has been considered in numerous cases. Charles C. Marvel, Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession, 8 A.L.R.4th 16 (1981 & Supp. 1999). Mentally retarded individuals present additional challenges for the courts because they may be less likely to understand the implications of a waiver. United States v. Murgas, 967 F. Supp. 695, 706 (N.D.N.Y. 1997). As one commentator has suggested, the mentally retarded are "less likely to understand their Miranda rights and the consequences of waiving them, giving rise to concerns about the knowing intelligence of their waivers." Paul T. Hourihan, Earl Washington's Confession: Mental Retardation and the Law of Confessions, 81 Va. L. Rev. 1471, 1492 (1995).

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] waive, the constitutional rights embraced in the Miranda rubric." Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

Blackstock, 19 S.W.3d at 208.

When the trial court denied the Defendant's motion to suppress it stated:

Well, looking at the proof here and just for reasons for my finding I find that [the Defendant's] rights were read to him before he signed the waiver. That he understood his rights. He understood that he had a right to a lawyer and if he couldn't afford a lawyer one would be provided to him free of charge. As far as credibility issues here I find that Sergeant Peperone is a very credible witness. [The Defendant] on the other had has put me through a guilty plea where he has tried to manipulate the system. I observed him during that guilty plea and found him to be less than truthful. At some times he would understand things with clarity and at other times he would appear not to understand something when it was much simpler than what he did understand. And I think to a great extent [the Defendant] is malingering. I'm also taking into account the fact that he has had several other guilty pleas. He's given statements in other cases. He's been advised of his rights in other cases before. He is a street-wise young man. Looking at his psychological report – well, first, his letter . . . that he's low functioning and may require assistance with court proceedings but was found to be competent. Looking at his psychiatric evaluation there's nothing in there that makes me seem to feel that he is impaired to the extent that he can't understand these simple rights. It reflects a life where [the Defendant] has been using his apparent low functioning ability to his best advantage. When we tried to hear his guilty plea he used that to the advantage of trying to get a lesser plea than aggravated robbery, to simple robbery, and succeeded in getting that offer made but in his guilty plea he chose to roll the dice and try to get complete probation out of the State until the point at which the State and myself and also his attorney were a little exasperated and the State revoked his offer when they were first trying to sever his case from the co-defendant. I'm also looking at the content of this statement in which he describes in great detail what happened. . . . [He had a] very clear understanding of what happened. . . . [T]his man has a good thought process and a good memory at the time that his rights were read to him. He wasn't under the influence of anything or lack of medication that made him extremely slow to where he couldn't understand the rights that were read to him by Sergeant Peperone. Also looking at his psychological report after being interviewed the psychological report reflects on Page 2, "Presently by his report he is out on bond after being arrested on 9-8-01 for aggravated robbery. He used a loaded gun to attempt robbery at a grocery store. Today he says simply that this was not a good idea. He does acknowledge someone could have gotten killed." Not to say that because he may have committed this crime or admitted to the psychological person that therefore we should overlook his rights, on the other hand it shows that the statement that he gave to the police was true and correct, was not the product of any kind of duress or intimidation. I'm also considering his testimony today where he said that he signed this statement and then it was read to him. That makes absolutely no sense. If the police had obtained his signature why would they then take the time, since they had what they wanted, to then read a statement to him? It makes no sense that they would do that assuming the police were corrupt. It makes

no sense that they would do that in any case. I'm also considering his prior convictions for crimes involving dishonesty. So for all those reasons I make a finding in this case that [the Defendant] had a meaningful awareness of his Miranda rights and also he had an awareness of the consequences of waiving his rights, particularly his right to have an attorney. And he waived them freely and voluntarily. So I'm going to deny your motion [to suppress the Defendant's statement to police] . . . .

We conclude that, considering the totality of the circumstances, the evidence does not preponderate against the trial court's findings. The circumstances of this case are as follows. On the one hand, the evidence demonstrated that the Defendant is low-functioning and receives Social Security Income for his deficiency. The psychological report shows that, while the Defendant was competent to stand trial, he may need assistance understanding court proceedings. Officer Peperone testified that the Defendant seemed "slow" and required more thought on some of the questions than most. The Defendant has previously been placed in mental health facilities for "behavioral problems." The Defendant testified that he did not understand that he had a right to a lawyer when he gave his statement.

On the other hand, the trial court found that Officer Peperone was a credible witness and that the Defendant was not a credible witness, in part because he attempted to "manipulate the system" during his guilty plea and because some of his testimony did not make sense to the court. The court also found that the Defendant has given statements to police in other cases and has had an extensive history with the criminal justice system. We cannot conclude that the evidence preponderates against these findings by the trial court and, accordingly, we conclude that the trial court did not err when it refused to suppress the Defendant's statement to police. This issue is without merit.

### C. Sufficiency of the Evidence

The Defendant contends that the evidence presented is insufficient to sustain his conviction of four counts for aggravated robbery because no witness called by the State could positively identify the Defendant in court as the man who committed the robbery. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 199 Tenn. 298, 305,

12

286 S.W.2d 856, 859 (1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Aggravated robbery is defined by statute as, "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," which is "Accomplished with a deadly weapon . . . ." Tenn. Code Ann. §§ 39-13-401, -402. We conclude that the evidence is sufficient to sustain the Defendant's conviction. While none of the State's witnesses could positively identify the Defendant, the strength of the State's circumstantial evidence supports the conviction. The evidence shows that Warren saw two men robbing the Big Star grocery store and, as they exited the store, he chased them down the street and away from the store. As Warren chased these men, he noticed them discard several items into some bushes. He continued his chase until the police apprehended the men, one of whom was identified as the Defendant. Warren led officers to the bushes, where Officer Peperone discovered two .22 caliber handguns, several checks bearing the name Big Star and a shirt that matched the description of the shirt worn by one of the robbers. Further, the Defendant confessed to this crime and gave specific details regarding the sequence of events leading to the crime. Accordingly, considering this evidence in the light most favorable to the State, we conclude that it is sufficient to sustain the Defendant's conviction. This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we conclude that there is no reversible error in the judgments of the trial court and sufficient evidence exists to sustain the Defendant's convictions for aggravated robbery. Therefore, the judgments of the trial court are AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

13